FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2013 DEC -4 P 1: 39

CLERK US DISTRICT COURT
ALEXANDRIA. VIRGINIA

K2M, INC.                                )
751 Miller Drive SE                      )
Leesburg, VA 20175,                      )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        Civil Action No. 1:13cv1491
                                         )                          CMH/IDD
COLLEEN M. TUCCI MILNE                   )
8077 Caminito Gianna                     )
LaJolla, CA 92037,                       )
                                         )
                    Defendant.           )
                                         )

## NOTICE OF REMOVAL

Defendant Colleen Milne, pursuant to 28 U.S.C. § 1446, hereby notices removal of the above-captioned action. The grounds for removal are as follows:

1.    Colleen Milne is the defendant in an action pending in the Circuit Court for Loudoun County that is styled *K2M, Inc. v. Colleen Tucci Milne*, Case No. 84267. As required by 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon defendant are attached.

2.    This action was commenced on November 18, 2013, when plaintiff filed its complaint in the Circuit Court for Loudoun County. Defendant was served with the complaint on November 21, 2013.

3.    Thirty days have not elapsed since this action became removable to this Court, as required by 28 U.S.C. § 1446(b).

4.    Plaintiff is a Delaware corporation with its principal place of business in Leesburg, Virginia.

5.    Defendant is a citizen of California and was a citizen of California when the Loudoun County action was commenced.

6.    The matter in controversy in this action exceeds $75,000, exclusive of interest and costs.

7.    This action is a civil action in which the district courts of the United States have original jurisdiction pursuant to 28 U.S.C. § 1332 by reason of diversity of citizenship of the parties.

8.    Accordingly, this action may be removed to this Court pursuant to 28 U.S.C. § 1441.

9.    Upon the filing of this notice of removal, defendant, as required by 28 U.S.C. § 1446(d), will give written notice thereof to plaintiff and will file a copy of the notice of removal with the Clerk of Circuit Court for Loudoun County.

Respectfully submitted,

Charles B. Wayne (VSB # 24954)
DLA Piper LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

*Counsel for Defendant*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of December, 2013, a copy of the foregoing Notice of

Removal was served by hand on:

> Joseph J. Aronica
> Duane Morris LLP
> Suite 1000
> 505 9th Street, N.W.
> Washington, D.C. 20004

and by email on:

> Shannon Hampton Sutherland
> Duane Morris LLP
> 30 South 17th Street
> Philadelphia, PA 19103

_Charles B. Wayne_
Charles B. Wayne

# COMMONWEALTH OF VIRGINIA



LOUDOUN CIRCUIT COURT
Civil Division
18 E MARKET ST/PO BOX 550
LEESBURG VA 20178-0550
(703) 777-0270

Summons

To: COLLEEN M TUCCI MILNE              Case No. 107CL00084627-00
(SPECIAL PROCESS SERVER)

The party upon whom this summons and the attached complaint are served is hereby notified
that unless within 21 days after such service, response is made by filing in the clerk's office
of this court a pleading in writing, in proper legal form, the allegations and charges may be
taken as admitted and the court may enter an order, judgment, or decree against such party
either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, November 20, 2013

Clerk of Court: GARY M CLEMENS

by _____Sandra Amundson_____
(CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:   ARONICA, JOSEPH J
505 9TH ST NW, STE 1000
202-776-7824
WASHINGTON DC 20004-2166

VIRGINIA:

IN THE CIRCUIT COURT OF LOUDOUN COUNTY

K2M, INC.,                                      )
751 Miller Drive SE                             )
Leesburg, Virginia 20175,                       )
                                                )
          Plaintiff,                            )
                                                )
v.                                              )     Case No.: 84627
                                                )
COLLEEN M. TUCCI MILNE,                         )     **JURY TRIAL DEMANDED**
Serve:                                          )
          47537 Darkhollow Falls Terrace        )
          Sterling, Virginia 20165,             )
                                                )
          Defendant.                            )

## VERIFIED COMPLAINT

Plaintiff, K2M, Inc. ("Plaintiff" or "K2M"), by and through its undersigned counsel, files this Verified Complaint against Defendant, Colleen M. Tucci Milne ("Milne"), and in support thereof avers as follows:

## INTRODUCTION

1.      Through this action, K2M seeks to enjoin Milne, a former K2M Product Manager who resigned to work in a competitive Product Manager role for K2M's direct competitor, from violating her obligations and duties to K2M – including Milne's Confidentiality and Non-Competition Agreement (the "Non-Competition Agreement," a true and correct copy of which is attached as Exhibit "A") and Intellectual Property and Invention Agreement (the "IP Agreement," a true and correct copy of which is attached as Exhibit "B") (collectively referred to herein as the "Employment Agreements") – and from further accessing, retaining, using, or disclosing K2M's confidential, proprietary, and trade secret information.

2.     On October 30, 2013, Milne resigned from K2M to become a Product Manager – the same position she held for K2M – for ("NuVasive"), K2M's direct competitor, drawing upon the confidential information to which she was exposed as an employee of K2M in Virginia.

3.     K2M has also learned that, in the time period leading up to Milne's departure from K2M, Milne caused K2M to incur expenses associated with Milne's undisclosed interview with her new employer, accessed great volumes of K2M confidential, proprietary, and trade secret information, and stored such information on a third-party "cloud" data storage site, where it now, upon information and belief, remains accessible to Milne and her new employer.

4.     K2M seeks to enjoin Milne from working for NuVasive as a Product Manager, or other role that competes with K2M, from soliciting or conducting competing business with the same consultants and customers with whom she had direct contact on behalf of K2M, from retaining, access, using, or disclosing K2M's confidential, proprietary, and trade secret information, from further benefiting from her improper activities to-date, and from further breaching her other obligations to K2M, including under the Employment Agreements.

## THE PARTIES

5.     Plaintiff K2M is a Delaware corporation with its principal place of business at 751 Miller Drive, SE, Leesburg, Virginia 20175, in Loudoun County.

6.     K2M is a citizen of the Commonwealth of Virginia and the State of Delaware.

7.     Milne is a former K2M employee. During her employment with K2M, and while Milne gained access to the information, customer relationships, and goodwill that are at issue, Milne lived in Loudoun County, Virginia, and worked at K2M's headquarters in Loudoun County, Virginia.

2

8.    Milne's last known address is 47537 Darkhollow Falls Terrace, Sterling, Virginia 20165, in Loudoun County, Virginia.

9.    Milne is a citizen of the Commonwealth of Virginia.

### JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over Defendant under Va. Code Ann. § 8.01-328.1 because, among other things, the causes of action asserted in this Complaint arise from Defendant: transacting business in this Commonwealth; contracting to supply services in this Commonwealth; causing tortious injury by an act or omission in this Commonwealth; and/or causing tortious injury in this Commonwealth by an act or mission outside of this Commonwealth where Defendant regularly does or solicits business, or engages in other persistent courses of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth. This Court also has personal jurisdiction over Defendant because the parties consented and submitted to the personal jurisdiction of the courts of the Commonwealth of Virginia for Loudoun County.

11.    Venue is proper in this Court under Va. Code Ann. § 8.01-262 because Defendant resides in Loudoun County, Virginia; there exists a practical nexus to this forum, including, but not limited to, the location of fact witnesses, the location of Plaintiff, or the location of other evidence to the action, it is the forum wherein Defendant regularly has conducted substantial business activity; it is the forum wherein the cause of action, or a part thereof, arose; it is the forum wherein personal property at issue is physically located or evidence of the property is located; and/or it is the forum wherein the Defendant has property or debts owing to her subject to seizure by civil process; and, to the extent that Defendant has become a non-resident of the Commonwealth, it is the forum where Plaintiff resides. Venue is also proper in this Court

because the parties consented, agreed, and submitted to venue and personal jurisdiction in the courts of the Commonwealth of Virginia for Loudoun County.

## FACTUAL BACKGROUND

12.    K2M is the largest privately held spinal company in the world focused on the research, design, development, and commercialization of innovative solutions, including implants, biologics, instrumentation, and related technologies, for use in surgery to repair the human spine.

13.    K2M is recognized as a global leader in providing unique technologies for the treatment of deformity, degenerative, trauma, and tumor spinal patients.

14.    K2M's product development pipeline includes, for example: spinal stabilization systems, minimally invasive systems, biologics, and other advancing technologies, such as motion preservation, annular repair, and nucleus replacement.

15.    The spinal industry within which K2M operates is a knowledge-based, hi-tech, and highly competitive industry.

16.    K2M competes with other spine companies, like Milne's new employer, NuVasive, for the business of physicians (including neurosurgeons and orthopedic surgeons) and the hospitals, medical centers, and healthcare facilities where they practice.

17.    The protection of K2M's goodwill and confidential, proprietary, and trade secret information is vital to prevent competitors or would-be-competitors from obtaining an unfair advantage over K2M.

18.    K2M invests millions of dollars in the development and marketing of its technology, systems, and products, the protection of its confidential information, and market growth.

19.     K2M also makes a significant investment of time in the development of its relationship and goodwill with its customers, and in its product development efforts, including through its relationships with its consultants and key opinion leaders.

20.     K2M's success is tied to its customer and key opinion leader relationships. To grow its customer base and to build and strengthen existing customer relationships, K2M provides prospective and current customers with hands-on-attention, training, and support. K2M also offers its customers innovative products and special custom solutions to fit its customers' varied needs.

21.     In the spinal device and biologics industry, Product Managers, like Milne, are at the center of those product development, marketing, and relationship-building activities.

**Milne's Employment with K2M, K2M's Investment in Milne, and Milne's Access to Confidential, Proprietary, and Trade Secret Information on Behalf of K2M**

22.     K2M employed Milne at its Leesburg, Virginia headquarters from September 2, 2008, until October 31, 2013, upon her resignation.

23.     When K2M hired Milne two years after she graduated from college, Milne had *no prior experience or training* in the medical device, biologics, or spine industry or as a Product Manager.

24.     K2M initially hired Milne on September 2, 2008 as a Marketing Assistant.

25.     In 2009, K2M promoted Milne to an Associate Product Manager.

26.     Thereafter, on September 2, 2011, K2M again promoted Milne to Product Manager – a position that she held until her resignation.

27.     During her employment, K2M trained Milne in the medical device, biologics, and spine industry as a new-comer "from the ground up," and invested significantly in Milne.

5

28.     Milne received a substantial amount of highly specialized training on the technical aspects of K2M's products and the medical procedures in which these products are used. This training focused on techniques for educating K2M's customers and sales representatives so that Milne could be a resource to them on the use of new and existing products.

29.     Milne's job responsibilities at K2M exposed her to a significant amount of confidential, proprietary, and trade secret information, which belonged to and was developed on behalf of and at the expense of K2M.

30.     As a Marketing Assistant, Milne was expected, for example, to support all marketing initiatives, including development and management of marketing collateral/material, distribution of various communications, competitive analysis, market research, industry and corporate events, and general support for the marketing department.

31.     Milne's responsibilities and exposure to confidential and trade secret information further increased after she was promoted to Associate Product Manager and still further when she became Product Manager.

32.     As an Associate Product Manager, and even further as a Product Manager, Milne became the face of K2M to its customers and consultants/key opinion leaders, with whom she worked. Through her relationships with these customers, K2M sought to grow and strengthen its customer relationships and improve its product development.

33.     As a K2M Associate Product Manager and later as a Product Manager, Milne was considered, by K2M and its customers and key opinion leaders, to be an expert in the product lines she managed and the products that were used in conjunction with those products in spine surgery.

6

34.     In that capacity, Milne trained K2M's customers, sales representatives, and agents/distributors on the technical aspects of K2M's products and provided guidance to them in the operating room.

35.     Milne also met with K2M's customers, consultants, and key opinion leaders to learn their likes and dislikes about K2M products and to design and refine custom solutions to meet their individualized needs and to gain insight on the needs of K2M's customers.

36.     Milne also served (at K2M's expense) as K2M's representative at several industry societies, and worked with closely with key physician opinion leaders as part of such physicians providing K2M product consulting services and presentations on K2M's behalf.

37.     K2M further invested in Milne by providing financial assistance of $12,040.64 for her to obtain her MBA from George Washington University in 2011.

38.     Indeed, K2M compensated Milne well for her work, reflecting her level of responsibility and K2M's trust placed in her.  In the five years she was with K2M, Milne's salary nearly doubled.

39.     Through her interactions, Milne gained access to information about, for example, K2M customer preferences, product usage and volumes, product pricing and discount terms, and product challenges.

40.     The customer and consultant relationships that Milne forged, developed, and enhanced, on K2M's behalf and through her work for K2M at K2M's expense, represented significant business and goodwill.

41.     Milne was responsible for, among other things:

    A.     the global development and continued success of K2M product lines;

    B.     recruiting and directing surgeon focus groups to design and develop new and innovative products that increase competitiveness and grow market share;

DM1V348462.1

C.    cultivating surgeon, sales representative, distributor, and client relationships and managing continued client engagement as the key point of contact for all products;

D.    meeting with customers, key opinion leaders, consultants and design teams relative to, and evaluating, K2M's IP portfolio, product line expansion, and product improvements;

E.    traveling across the United States and internationally to meet with customers, key opinion leaders, sales representatives, and agents/distributors about K2M and its products;

F.    providing training and guidance on the technical aspects of K2M's products to K2M customers, sales representatives, and agent/distributors;

G.    planning and executing the global launch of critical, strategic products;

H.    predicting, evaluating, and responding to shifts in market trends by engaging in market analysis, proposing new products and product modifications, and effecting changes to product lines;

I.    creating global marketing strategies to highlight product messaging and brand positioning;

J.    preparing pricing analyses and designing and implementing pricing strategies for domestic and international sales teams;

K.    forecasting short and long term product revenues to support the company's annual corporate budget and strategic planning;

L.    tailoring and implementing global product training programs for surgeons, hospital staff members, and health care industry representatives who use the company's products;

M.    providing guidance to customers and consultants during surgical procedures; and

N.    leading cross-functional teams to identify and maximize market opportunities, while simultaneously improving efficiency among current products lines.

42.    For Milne to perform her increasingly high profile roles with K2M, Milne was permitted access and exposed to extensive highly confidential, trade secret, and increasingly high-level, information about, among other things, K2M's:

8

A.  product development (including, but not limited to, product designs, product development pipeline, timeline, plans, strengths, challenges, evaluations, and strategies);

B.  product alpha and beta evaluations;

C.  product and design strengths, weaknesses, challenges, proposals, and solutions;

D.  product improvements or enhancements;

E.  top customer and consultant relationships;

F.  top sales representative and distributor relationships;

G.  strategies to engage with certain thought-leading and rising star surgeons, known as key opinion leaders, and the nature and quality of K2M's relationships with them;

H.  sales, marketing, promotional, and business plans, forecasts, strengths, challenges, and strategies;

I.  product and sales training;

J.  finances (including, but not limited to, sales volumes, revenue, pricing analyses, pricing strategies, pricing, manufacturing costs, profits, commission plans, and return on investment analyses;

K.  consultant and key opinion leader relationships;

L.  sales representative and distributor relationships;

M.  customers (including, but not limited to, preferences, needs, product usage and volumes, pricing, discount terms, strengths, challenges and concerns, and special instrumentation);

N.  surgeon relations; and

O.  and other confidential, proprietary, and trade secret information.

43.   In short, Milne has a roadmap of K2M's product development, introduction, and marketing plans over the next several years, as well as a detailed analysis of the risks and benefits of the planned projects.

44.    If a competitor were to learn the confidential, proprietary, and trade secret information K2M shared with Milne through her position of trust, K2M would suffer immediate and irreparable harm.

### K2M Treats the Information It Shared with Milne as Highly Confidential

45.    To protect its (a) investment in product development and technology, (b) investment in Milne, (c) proprietary knowhow, (d) customer, consultant, and key opinion leader relationships, and (e) other valuable confidential and proprietary information and trade secrets, K2M required Milne (and other similarly situated employees) to sign, and Milne did sign, the Non-Competition Agreement (Exhibit A) and IP Agreement (Exhibit B) when she joined K2M.

46.    K2M sought to protect its customer relationships and confidential information by requiring Milne, as a condition of employment, like other employees, to agree to protect, and not to disclose or use K2M's confidential and/or proprietary information, and that such information belonged to K2M. (Exhibit A and Exhibit B).

47.    In the Non-Competition Agreement, Milne also agreed, as a condition of her employment with K2M, that she would not, whether during the term of her employment with K2M or thereafter, disclose K2M's confidential information, as defined by the Non-Competition Agreement, to any third party or use any such information for her own benefit or for the benefit of any third party. (*See* Exhibit A.)

48.    The confidential information Milne agreed not to disclose includes, *inter alia*, know-how, trade secrets, confidential and proprietary technical, business, and financial information, customer lists, customer data, sales and statistical data, etc. (Exhibit A).

49.    K2M also required Milne, like other employees, to return, and not retain, copies of, any of K2M's confidential and/or proprietary information (including the information

10

described above), correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contained any of this information and other similar information upon her separation from her employment with K2M. (Exhibit A).

50.     K2M further protects its confidential, proprietary, and trade secret information by limiting physical access to information. For example, K2M's servers and computer systems are subject to password protection, and system access is segregated by job function. Moreover, access to K2M's facilities is subject to numerous security measures, including a headquarters front desk attendant, key card entry system, and a strictly-enforced policy requiring visitor sign in and sign out.

### Milne's Non-Competition and Non-Solicitation Covenants with K2M

51.     Milne also agreed that, for a period of one year, she would neither compete against K2M nor solicit the customers with whom she had contact while employed by K2M. *See* Exhibit A, incorporated by reference.

52.     As noted above, Milne signed the Non-Competition Agreement on August 11, 2008, in connection with the commencement of her employment with K2M.

53.     Milne expressly acknowledged in the Non-Competition Agreement that, in consideration of her employment with K2M she received adequate consideration in exchange for her compliance therewith.

54.     K2M would not have hired and paid Milne, trained her "from the ground up," promoted her, or given her such high level access to K2M's confidential information and customer and consultant relationships if she had not signed the Non-Competition Agreement.

11

55.     Milne further agreed, in the Non-Competition Agreement, to refrain, for a period

of one year, from working, for, or on behalf of, any business which provides the same or similar

products or services as K2M, unless and to the extent Milne's role with such a company would

not compete with the business conducted by K2M.

56.     Specifically, Milne agreed that, for one year, she shall not:

> Within the United States, open, manage, operate, be employed by,
> participate in, or act on behalf of any business which renders the
> same or similar products or services as Company, expressly
> provided however, that this covenant does not preclude Employee
> from working in the medical device industry in some role which
> would not compete with the business conducted by Company at the
> time of termination of this Agreement.

(Exhibit A).

57.     Milne also agreed, for one year, to refrain from soliciting or having any contact

with, for a competitive purpose, K2M current or prospective customers with whom Milne had

contact while employed by K2M.  Specifically, Milne agreed that she shall not:

> Engage in the solicitation of, or have contact with, any customer of
> the Company who was a customer or prospective customer of the
> Company during Employee's employment term, whom Employee
> had contact with, if the contact or solicitation is competitive with
> the business conducted by Company at the time of termination of
> this Agreement.

(Exhibit A).

58.     The restrictions in the Non-Competition Agreement are reasonable in scope and

time, as they limit Milne, during the course of her employment, and for only one year thereafter,

from (a) competing with K2M in a geographic area smaller than the area Milne (who had global

responsibilities for K2M and traveled extensively for K2M at K2M's expense) covered while

employed by K2M, and in a role that is competitive with the business K2M conducted at the time

of her departure; and (b) soliciting or having contact for a competitive purpose with the

12

customers with whom Milne had actual contact while employed by K2M. Thus, and particularly in light of Milne's position and exposure to high-level information about K2M and its business, the restrictions do not impose a greater restraint than necessary to protect K2M's legitimate business interests.

59.   In the Non-Competition Agreement, Milne also acknowledged and agreed that the restrictive covenants contained in the agreement

> are reasonable for the protection of the Company and that the restrictions contained in these paragraphs will not unduly interfere with []her capacity to find gainful employment in other business activities.

(Exhibit A).

60.   Milne also acknowledged that:

> a breach or threatened breach of the provisions of the [Non-Competition] Agreement may give rise to irreparable injury to the Company, inadequately compensable in damages and, accordingly, agree[d] that the Company may seek and obtain injunctive relief, temporary, preliminary, or permanent, against such breach or threatened breach, in addition to recovering monetary damages . . . [and that] greater injury would result by refusing the Company or its successors or assigns injunctive relief than by granting such injunctive relief.

(Exhibit A).

61.   The Non-Competition Agreement provides for the award of attorneys' fees and costs incurred in connection with the enforcement of the Agreement:

> The Company shall also be entitled to recover from Employee its reasonable attorneys' fees and costs of any action that it successfully brings against Employee for breach or threatened breach of this agreement.

(Exhibit A).

62.   Similarly, the IP Agreement provides for attorneys' fees. (Exhibit B).

13

63.    The Non-Competition Agreement and IP Agreement were entered into in Virginia, and are governed by Virginia law.  (*See* Exhibits A and B).

## Milne's New Position with K2M's Direct Competitor

64.    On October 3, 2013, Milne booked round-trip travel, at K2M's expense, from Dulles Airport in Virginia to San Francisco on October 20, 2013, with a flight to return to Virginia on Thursday, October 24, 2013.  The purpose of this travel was for Milne to attend, in her role as a K2M Product Manager, and on K2M's behalf, the Annual Meeting of the Congress of Neurological Surgeons in San Francisco.

65.    On October 16, 2013, after receiving her interview request from NuVasive, Milne changed her flight schedule, unbeknownst to her K2M supervisors.  Instead of returning to Virginia on October 24, 2013, as scheduled, Milne changed her flight to fly from San Francisco to San Diego (where NuVasive is located) on October 24, 2013, and from San Diego to Dulles on Friday, October 25, 2013.

66.    Milne did not inform her K2M supervisor of any K2M business scheduled in San Diego, nor is her supervisor aware of any K2M business Milne conducted in San Diego at that time.

67.    Rather, NuVasive, the direct competitor of K2M for which Milne has accepted employment, is headquartered in San Diego.

68.    Milne did not ask her K2M supervisor for permission in advance to take vacation or personal time for the extra time she spent traveling to or visiting San Diego, nor did she report vacation or personal time to K2M after-the-fact.

69.    Despite being required to input her personal credit card information for the charges for her personal flights, Milne initially caused K2M to incur, on its corporate AMEX, the

14

$507.50 in extra charges associated with her personal trip to K2M's competitor. Milne eventually informed K2M of the personal nature of these charges a week after her resignation, after K2M had discovered the previously undisclosed personal trip.

70.     On October 30, 2003, five days after returning to Virginia from her trip to NuVasive, Milne tendered her resignation to K2M.

71.     After K2M's unsuccessful attempt to have her remain with the company, Milne's last day of employment as a K2M Product Manager was October 31, 2013.

72.     Milne has informed K2M that she has already accepted employment as a Product Manager for NuVasive, and that she will begin for working for NuVasive during the first week of December, 2013.

73.     K2M and NuVasive directly compete in the highly competitive market of medical devices and biologics for use in spinal surgery, with directly competitive products.

74.     The Product Manager position that Milne has accepted with NuVasive is competitive with K2M.

75.     Milne's NuVasive offer letter does not assign to her a particular product line.

76.     Regardless of whether Milne's new Product Manager position with NuVasive involves device implants or biologics, it will require her to draw upon the confidential, proprietary, and trade secret information and customer, representative/distributor, and consultant goodwill to which Milne was given access on behalf of K2M and upon the confidential, proprietary, and trade secret information which, as described further below, Milne has misappropriated; will require her to market competitive products to the same customers to whom she marketed K2M products; and violates her agreements with K2M.

15

77.     According to his LinkedIn profile, the NuVasive director to whom Milne will report on behalf of NuVasive has responsibility for both biologics and thoracolumbar fixation implants – all of which are areas in which NuVasive and K2M compete head-to-head.

78.     In her competitive role with NuVasive, Milne will be eligible for a significant bonus based not only on her own overall performance, but also on NuVasive's achievement of its operational goals.

79.     Thus, in her new role with K2M's direct competitor, Milne is incentivized to breach her obligations to K2M.

### Milne's Accessing of Confidential K2M Documents and Information Leading Up to and After Her Resignation

80.     Indeed, after Milne's departure from K2M, K2M learned that Milne has done just that.

81.     Upon her departure from K2M, K2M asked Milne to return all documents, information, records, and materials pertaining to K2M, its customers, and its business.

82.     Indeed, pursuant to her Employment Agreements, Milne was required to do so. *See* Exhibits A and B.

83.     During her exit interview, K2M asked Milne whether she had taken any records home or had access to anything related to her work on her personal accounts.

84.     Milne represented to K2M that she had no such record or access.

85.     K2M also instructed Milne (as her Employment Agreements required) that she needed to return all records, files, and materials that pertain to K2M, K2M business, or K2M customers, wherever they are located, and regardless of whether they were in hard copy or electronic form.

DM1\4348462.1

86.    Milne represented to K2M that she did not have any such records, files, or materials outside of the office.

87.    Milne also represented to K2M that she did not have any such records, files, or materials on any personal devices, drives, cloud storage, etc., or in any of her personal accounts.

88.    These representations were false.

89.    K2M's investigation is continuing, and examples of Milne's unauthorized conduct are set forth below.

_Use of Cloud Accounts to Access K2M Confidential, Proprietary, and Trade Secret Information_

90.    K2M now knows that Milne's undisclosed efforts to leave K2M date back at least the end of August, 2013.

91.    After she began interviewing with competitors, and again on the few days leading up to her resignation, Milne accessed substantial volumes of K2M information through cloud accounts.

92.    "Dropbox" is a cloud storage tool, whereby the user stores files on the Dropbox server in "the cloud" and accesses them through multiple computers, phones, and the Dropbox website.

93.    On September 5, 2013, after she began interviewing with competitors, Milne set up a Dropbox account.

94.    Among the files Milne stored and accessed on the Dropbox cloud storage on September 5, 2013, are: K2M internal product presentations for K2M's CAYMAN product; and detailed training materials concerning K2M's minimally invasive systems, including K2M's RAVINE, SERENGETI, TERRA NOVA products (including, but not limited to, training study guides, product information, surgical technique guides, product matrices, techniques, challenges, and indications for use, internal sales, marketing, and use tips and tricks, product strengths and

17

challenges, keys to successful product marketing and use, product positioning, and clinical research and results).

95.    Just days later, Milne accessed a "Hightail" account.

96.    Hightail is used to share, send, and access files stored in the Hightail cloud from any device.

97.    Milne accessed the Hightail account again on October 15, 2013 – after hearing from NuVasive about an interview, and the day before she changed her flight schedule to accommodate her undisclosed interview with NuVasive.

98.    In addition, *after* Milne's clandestine interview at NuVasive in late October, and during the days leading up to and just after her resignation, Milne accessed highly confidential K2M files through "Google Drive."

99.    Google Drive is a file storage and synchronization service provided by Google, which enables user cloud storage, file sharing, and collaborative editing.

100.    For instance, after returning from NuVasive, on the afternoon and late night of Sunday, October 27, 2013, Milne accessed at least the following through Google Drive:

(a) Google Drives called:

i.    "K2M – Google Drive",

ii.    "VIKOS Allografts – Google Drive",

iii.    "VIKOS – Google Drive",

iv.    "VESUVIUS Demineralized Allografts – Google Drive",

v.    "VENADO Synthetic Bone Grafts – Google Drive",

vi.    "Spanish Training PPTs – Google Drive",

vii.    "8-2013 SANTORINI Level II Training – Google Drive",

18

    viii.  "SANTORINI – Google Drive",

    ix.  "PNG SANTORINI UPDATED PPT – Google Drive",

    x.  "RAVINE – Google Drive", and

    xi.  "2012 – Google Drive";

(b) K2M product presentations and training materials;

(c) documents concerning K2M's plate technology and Complex Spine Unit;

(d) documents concerning K2M biologic products, including VIKOS Allografts, VESUVIUS Demineralized Allografts, VENADO Synthetic Bone Grafts, and

(e) documents concerning K2M's SANTORINI corpectomy cage system products.

101.    On Thursday, October 30, 2013 – after she received her formal offer letter from NuVasive, and just before she informed her K2M supervisors that she was resigning – Milne accessed, in succession, additional Google Drive Documents concerning K2M products, including K2M's CAYMAN, SANTORINI, RAVINE, BLUE RIDGE, PYRANEES, CASPIAN, RANGE, and deformity products.

102.    On the morning of Friday, October 31, 2013 – her last day at K2M, Milne again accessed the "K2M – Google Drive."

103.    These cloud storage accounts were set up by Milne, with passwords that Milne controls.  Accordingly, K2M is unable to access these critical documents or track their usage.

104.    Moreover, unless these cloud storage accounts are disabled, and Milne's further use is examined, the accounts provide a means for Milne, and anyone else to which she has given or gives access, to further access, transfer, or share K2M's confidential, proprietary, and trade secret information.

DM1\4348462.1

*Milne's Further Access to K2M's Confidential, Proprietary, and Trade Secret Information
on her Way Out the Door to K2M's Competitor*

105.   In addition to Milne's accessing of K2M confidential information through the "cloud," on the day before, and day of, her resignation, Milne accessed additional confirmation information through K2M's servers.

106.   K2M's investigation is continuing, and below are examples of Milne's wrongful conduct.

107.   On October 30, 2013, just before Milne resigned, she performed an internet search on how to export the contact information that resided in her K2M Outlook account.

108.   On that same day, Milne misappropriated her entire K2M Outlook contact database, including, in a "one stop shopping format," customer, consultant, employee, and distributor names, titles, addresses, business and mobile phone numbers, e-mail addresses, other contact information, personal and family information, and notes (including, in some instances, surgeon preferences, likes, and dislikes), by exporting it to an Excel file and e-mailing the Excel file from K2M's e-mail system to her personal e-mail account.

109.   The contacts and information in this Outlook contact database were K2M's property, and represented information and goodwill built up over the course of five years, on K2M's behalf, and at K2M's expense.

110.   Indeed, prior to joining K2M, Milne had no prior spine, medical device, or biologics experience or training, and, upon information and belief, had no contacts in the industry.

111.   In addition, on the days leading up to Milne's resignation, and after her NuVasive interview, Milne accessed other confidential K2M documents, for example, product PowerPoint presentations concerning K2M biologic products (including VESUVIUS Demineralized

20

Allografts and VIKOS Allografts); marketing plans; forecasts; surgical techniques; product sheets; other product documents; and documents and minutes concerning K2M silos – which are highly confidential product development meetings including K2M and its consultants.

112.    Based on Milne's pattern of conduct described above, and her access to K2M's confidential, proprietary, and trade secret information on her way "out the door" to the same position with K2M's competitor, K2M believes, and therefore avers, that Milne has used and/or will use this information on behalf of herself and K2M's direct competitor, NuVasive, in her competitive role as a Product Manager.

113.    Milne's conduct has already caused and, if unrestrained, will continue to cause, direct, irreparable, and other harm to K2M in its business by, among other things, loss of confidential information, market share, profits, goodwill, and reputation, and the benefit of its bargain with Milne.

## COUNT I
## BREACH OF DUTY OF LOYALTY

114.    K2M incorporates by reference each of the foregoing allegations of Paragraphs 1-113 set forth above as though set forth fully herein.

115.    As an employee of K2M, Milne owed K2M duties of utmost good faith, loyalty, and honesty.

116.    During her employment with K2M, Milne was obligated to act in good faith and with due regard to the interests of K2M.

117.    So long as Milne remained employed by K2M, K2M depended on Milne to act only in K2M's best interests.

118.    Milne breached her duty of loyalty to K2M by the aforementioned conduct prior to the termination of her K2M employment, including taking an undisclosed trip to interview

21

with K2M's competitor, at K2M's expense and without requesting or taking vacation or personal time; accessing, in the time period leading up to her departure from K2M, K2M documents confidential information that will be useful in her new competitive employment, with the undisclosed knowledge that she was leaving K2M; and misappropriating K2M documents and confidential information to which she was entrusted as a K2M employee and which would be useful to K2M's direct competitor.

119.    These activities were contrary to K2M's interests and, upon information and belief, were designed to further Milne's own interests, and the interests of NuVasive, K2M's direct competitor.

120.    K2M has suffered, and will continue to suffer, damages, including irreparable harm, monetary damages, attorneys' fees, and costs, as a result of Milne's unlawful activities.

## COUNT II
## BREACH OF CONTRACT – IP AGREEMENT

121.    K2M incorporates by reference each of the foregoing allegations of Paragraphs 1-120 set forth above as though set forth fully herein.

122.    The IP Agreement between K2M and Milne is a valid and enforceable agreement.

123.    K2M satisfied its obligations under the IP Agreement.

124.    The IP Agreement required and continues to require Milne to return to K2M, and to refrain from using or disclosing, K2M's confidential, proprietary, and trade secret information. *See* Exhibit B, incorporated by referenced.

125.    Milne has breached, and will breach, her contractual obligations to K2M by accessing, retaining, using, and/or disclosing K2M's confidential and proprietary information, including the information described above, including for the benefit of herself and her new employer, NuVasive.

22

DM1\4348462.1

126.    Unless the relief requested herein is granted, Milne will continue, among other things, to: (a) compete with her former employer; (b) take advantage of the access that K2M gave her to its valuable business relationships, goodwill, and confidential and proprietary business information, and (c) solicit, have contact for competitive purposes with, or continue to do business for competitive purposes with, K2M customers and consultants with whom she had contact on behalf of K2M, and concerning whom she misappropriated K2M information, all in violation of Milne's contractual obligations.

127.    Milne's breaches of contract are a direct and proximate cause of K2M's damages.

128.    All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

129.    Milne's acts alleged herein were performed without the consent of K2M.

130.    K2M has suffered, and will continue to suffer, damages, including irreparable harm, monetary damages, attorneys' fees, and costs, as a result of Milne's unlawful activities.

**COUNT III**
**BREACH OF CONTRACT – NON-COMPETE AGREEMENT**

131.    K2M incorporates by reference each of the foregoing allegations of Paragraphs 1-130 set forth above as though set forth fully herein.

132.    The Non-Competition Agreement between K2M and Milne is a valid and enforceable agreement.

133.    K2M satisfied its obligations under the Non-Competition Agreement.

134.    Milne agreed that, during her employment with K2M, and for one year, she would not:

> Within the United States, open, manage, operate, be employed by, participate in, or act on behalf of any business which renders the same or similar products or services as Company, expressly

23

> provided however, that this covenant does not preclude Employee
> from working in the medical device industry in some role which
> would not compete with the business conducted by Company at the
> time of termination of this Agreement.

(Exhibit A).

135.    Milne also agreed, for the same time period, to refrain from soliciting or having

any contact with, for a competitive purpose, K2M current or prospective customers with whom

Milne had contact while employed by K2M.  Specifically, Milne agreed that she shall not:

> Engage in the solicitation of, or have contact with, any customer of
> the Company who was a customer or prospective customer of the
> Company during Employee's employment term, whom Employee
> had contact with, if the contact or solicitation is competitive with
> the business conducted by Company at the time of termination of
> this Agreement.

(Exhibit A).

136.    Milne breached, and will breach, this agreement by, within the restricted period,

accepting employment with and working for NuVasive, a direct competitor of K2M, in a role

that is competitive with the business K2M conducted at the time Milne resigned from K2M.

137.    Milne has also breached, and will breach, this agreement by, within the restricted

period, and for the purpose of competing with K2M, engaging in the solicitation or contact,

competitive with K2M's business, of the customers and consultants of K2M with whom Milne

had contact while employed by K2M and concerning which she has misappropriated K2M

information.

138.    The Non-Competition Agreement also required and continues to require Milne to

return to K2M, and to refrain from accessing, using, or disclosing, K2M's confidential,

proprietary, and trade secret information.  *See* Exhibit A, incorporated by reference.

139.    Milne has breached, and will breach, her contractual obligations to K2M by

retaining, accessing, using, and/or disclosing K2M's confidential and proprietary information,

24

DM1\4348462.1

including the information described above, including for the benefit of herself and her new employer, NuVasive.

140.    Unless the relief requested herein is granted, Milne will continue, among other things, to: (a) compete with her former employer; (b) take advantage of the access that K2M gave her to its valuable business relationships, goodwill, and confidential and proprietary business information, and (c) solicit, have contact for competitive purposes with, or continue to do business for competitive purposes with, K2M customers and consultants with whom she had contact on behalf of K2M, and concerning which she has misappropriated K2M information, all in violation of Milne's contractual obligations.

141.    Milne's breaches of contract are a direct and proximate cause of K2M's damages.

142.    All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

143.    Milne's acts alleged herein were performed without the consent of K2M.

144.    K2M has suffered, and will continue to suffer, damages, including irreparable harm, monetary damages, attorneys' fees, and costs, as a result of Milne's unlawful activities.

## COUNT IV
## VIOLATION OF THE VIRGINIA UNIFORM TRADE SECRETS ACT

145.    K2M incorporates by reference each of the foregoing allegations of Paragraphs 1-144 set forth above as though set forth fully herein.

146.    Milne acquired access to and knowledge of K2M's trade secrets in her role as Product Manager for K2M.

147.    The information Milne accessed, retained, used, and/or disclosed is information, including but not limited to, a formula, pattern, compilation, program, device, method, technique,

25

or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, within the meaning of Va. Code Ann. § 59:1-336.

148. K2M'S trade secrets are not available to the general public, and were compiled at substantial expense to K2M.

149. Milne used improper means to acquire knowledge of the trade secrets leading up to and after her resignation.

150. Alternatively, Milne acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.

151. By virtue of the aforementioned conduct, and her substantially similar job responsibilities at NuVasive, Milne has accessed, retained, disclosed and/or used and will access, retain, disclose and/or use, K2M's confidential information and trade secrets on behalf of K2M's direct competitor, NuVasive.

152. Such access, retention, use, and/or disclose is without K2M's express or implied consent.

153. By virtue of Milne's actual and threatened misappropriation of K2M's trade secrets, K2M has suffered, will suffer, and is threatened to suffer, immediate and irreparable harm.

154. Milne's actual or threatened misappropriation of trade secrets may be enjoined, pursuant to Va. Code Ann. § 59.1-337.

26

155. Milne's conduct has been willful and outrageous, and was undertaken with reckless indifference to K2M's rights.

156. In addition to its compensatory damages, K2M is entitled to its attorneys' fees pursuant to Va. Code Ann. § 59.1-338.1

## COUNT V
## CONVERSION

157. K2M incorporates by reference each of the foregoing allegations of Paragraphs 1-156 set forth above as though set forth fully herein.

158. Milne wrongfully and without authorization exercised dominion and control over property belonging to K2M, including the K2M documents referenced in Paragraphs 93 through 116 above.

159. Milne's actions have deprived K2M of the rightful possession of its property and therefore converted personal property rightfully owned by K2M.

160. Milne exercised dominion over and retained K2M's property intentionally, willfully, maliciously, and without any lawful justification.

161. K2M has suffered damages, including the loss of the converted property and its inability to use said property in the ordinary course of business.

27

WHEREFORE, K2M, Inc. demands judgment in its favor and against Defendant, Colleen M. Tucci Milne, on all Counts of the Verified Complaint, and for:

A. actual and compensatory damages that K2M is entitled to recover as a proximate result of Milne's breach of her duty of loyalty, breaches of her Employment Agreements, misappropriation of confidential information and trade secrets, conversion, in an amount which, upon information and belief, will exceed $100,000.00, subject to further discovery;

B. incidental, consequential, and punitive damages as permitted by law;

C. equitable relief as permitted, including, but not limited to, a temporary, preliminary, and permanent injunction, ordering Milne, and anyone acting in concert with her, to return immediately all K2M's property and confidential, proprietary, and/or trade secret information;

D. equitable relief, as permitted, including, but not limited to, a temporary, preliminary, and permanent injunction, restraining and enjoining Milne, and anyone acting in concert with her, from continuing to violate her Employment Agreements with K2M, including, but not limited to, by, (i) accessing, using, or disclosing K2M's confidential, proprietary, and/or trade secret information; and (ii) for a period of one year: (a) competing with K2M as a Product Manager or other position competitive to the position Milne held at K2M, and (b) directly or indirectly soliciting, having contact for a competitive purpose with, or engaging in business for a competitive purpose with K2M customers or consultants with whom Milne had contact on behalf of K2M, or concerning which she misappropriated K2M information, for the purpose of competing with K2M; and

E. pre-judgment and post-judgment interest;

F. K2M's reasonable attorneys' fees and costs related to this action; and

G. all such other relief as this Court deems appropriate.

## Attorneys' Fees Certification

Pursuant to Virginia Supreme Court Rule 3:25, K2M seeks to recover attorneys' fees from Defendant pursuant to the Non-Competition Agreement (Exhibit A), the IP Agreement (Exhibit B), and the Virginia Uniform Trade Secrets Act, Va. Code. Ann. § 59.1-338.1.

28

DM1\343462.1

Respectfully Submitted,

DUANE MORRIS LLP

Of Counsel:

Shannon Hampton Sutherland
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Tel: 215.979.1104
Fax: 215.979.1020
shsutherland@duanemorris.com
*Pro Hac Vice Application
to be filed*

Joseph J. Aronica (VSB No. 02548)
DUANE MORRIS LLP
Suite 1000
505 9th Street, N.W.
Washington, DC 20004-2166
Telephone: 202.776.7824
Facsimile: 202.478.1885
JJAronica@duanemorris.com

*Attorneys for Plaintiff, K2M, Inc.*

29

DM1\3484621

## VERIFICATION

I, Stuart Weikel, in my capacity as Group Product Manager, Complex Spine, for K2M, Inc., hereby state that I am familiar with the facts set forth in the foregoing Complaint and that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

This verification is made subject to the penalties of perjury for unsworn falsification to authorities.

_____
Stuart Weikel

Dated: 11/14/2013

# EXHIBIT "A"

Confidentiality and Non-Competition Agreement

This agreement (the "Agreement") is made this _11_ day of _August_, 2008 by and between K2M, Inc. (hereinafter "Company") and _Colleen Tucci_, (hereinafter "Employee").

In consideration of the Employee's employment, the receipt of certain confidential information from the Company and of the mutual covenants contained in this agreement, the parties agree as follows:

1. Confidential Information and Company Property.

   (a) For purposes of this Agreement, "Confidential Information" shall mean know-how, trade secrets and confidential and proprietary technical, business and financial information including, but not limited to, information with respect to concepts, ideas, research, customer lists, customer data and compilations of customer information (whether compiled by Employee or by Company), supplier lists, distributor lists, marketing plans, information concerning customers, financial figures, personnel, sales and statistical data, computer programs and information with respect to various techniques, procedures, processes, and methods and any other information (not known to the general public) in any way learned by Employee during his/her employment by the Company.

   (b) Employee acknowledges that the Company is engaged in research, product market development and sales in connection with its spinal implants and instrumentation manufacturing and distribution business, and that information pertaining to the Company's activities is and shall remain the property of the Company's and is to remain confidential. Employee may, during the course of employment, obtain and be given access to the aforementioned valuable proprietary Confidential Information which is developed, compiled, or utilized by the Employee or the Company in its business. Employee may also obtain access to certain Confidential Information of corporations that control, are controlled by, or are under common control with the Company (hereinafter "Affiliates") In consideration of the Employee's employment with Confidential Information, Employee agrees that he/she shall not, whether during the term of employment or thereafter, disclose any Confidential Information of the Company or its Affiliates to any third party or use such information for Employee's own benefit or for the benefit of any third party without written consent of the Company, until such time as that Confidential Information shall have properly become known to the general public. This shall include but not be limited to:

      i. Any information or documentation designed as confidential or secret, or of a trade secret or confidential nature; and

      ii. The Company's marketing plans, customer and user lists, research and development projects, internal policies and

practices, training materials, sales forecasts and statistics, customer lists and leads and information regarding the development of new products, whether patentable or not and K2M technologies used.

(c)   Removal or use of Confidential Information and Property of the Company. Employee shall not, except in the ordinary and usual course of his/her employment with the Company, remove from the premises of the Company any technical data sheets, work papers, documentation, price lists, product manuals, customer lists, information, equipment or any written document, computer discs or other tangible property belonging to the Company or any item of Confidential Information, or copies of all or any portion thereof. Further, Employee shall not copy or retain, for Employee's own or any other person's use, any information contained in or on said documents, disks, or other property. Upon termination or resignation of employment with the Company, Employee shall return to the Company all aforementioned documents, disks, and other property, and all copies or summaries of such material or any part thereof.

2.   Restricted Activities after Employment.  Recognizing the Company's legitimate interests in protecting its Confidential Information and its relationship with its customers and the difficulty of ascertaining whether or not such Confidential Information is being used in a manner inconsistent with the Employee's agreements set forth in paragraphs above, and recognizing that the Employee has the skills and knowledge to obtain gainful employment in a position which would not require the actual or apparent disclosure or use of such Confidential information by the Employee, and further recognizing the highly competitive nature of the Company's business, the Employee agrees that he/she shall not, during the one-year period immediately following the latter of:

    (a)    termination of employment with the Company;
    (b)    the date of the last violation of Paragraph 1(b) or the Paragraph 2; or
    (c)    the date of any final court determination that either such paragraph has been violated;

directly or indirectly on Employee's own behalf or on behalf of any person, corporation, partnership or other entity, whether as an agent, employee, consultant, or in any capacity:

    i.    Within the United States, open, manage, operate, be employed by, participate in, or act on behalf of any business which renders the same or similar products or services as Company, expressly provided however, that this covenant does not preclude Employee from working in the medical device industry in some role which would not compete with the business conducted by Company at the time of termination of this Agreement.

ii.    Engage in the solicitation of, or have contact with, any customer of the Company who was a customer or prospective customer of the Company during Employee's employment term, whom Employee had contact with, if the contact or solicitation is competitive with the business conducted by Company at the time of termination of this Agreement.

iii.    Contact or attempt to persuade any agents or employees of the Company or any of its Affiliates or subsidiaries to terminate their relationship with the Company or any of its Affiliates or subsidiaries.

iv.    Employee further acknowledges that his/her position with the Company may expose him/her to Confidential Information and more generally to a segment of business with respect to which Employee has had no prior exposure and thus may allow him/her to gain broad experience in this highly specialized and technical segment of the business. In view of thereof, Employee acknowledges and agrees that the restrictions of Paragraphs 1 and 2 are reasonable for the protection of the Company and that the restrictions contained in these paragraphs will not unduly interfere with his/her capacity to find gainful employment in other business activities. This Agreement is not intended to restrict Employee from performing work in some role that does not compete with the business of the Company.

v.    <u>Remedies.</u> Employee recognizes that a breach or threatened breach of the provisions of the Agreement may give rise to irreparable injury to the Company, inadequately compensable in damages and, accordingly, agrees that the Company may seek and obtain injunctive relief, temporary, preliminary or permanent, against such breach or threatened breach, in addition to recovering monetary damages from Employee. Employee hereby waives any right to require the Company to obtain a bond in connection with such proceedings. The Company shall also be entitled to recover from Employee its reasonable attorneys' fees and costs of any action that it successfully brings against Employee for breach or threatened breach of this agreement.

Employee further agrees and acknowledges that greater injury would result by refusing the Company or its successors or assigns injunctive relief than by granting such injunctive relief.

vi.    <u>Severability.</u> The Company and Employee agree that each and every paragraph, sentence, term, covenant, or provision

of this agreement shall be considered severable and that, in the event that a court of competent jurisdiction finds any paragraph, sentence, term or provision to be invalid or unenforceable, the validity and enforceability, operation or effect of the remaining paragraphs, sentences, terms and provisions shall not be affected and this Agreement shall be constructed in all respects as if the invalid or unenforceable matter has been omitted or limited.

vii.   Representation and Warranty of Employee. Employee expressly represents and warrants that he/she is presently subject to no contract or agreement with any person, firm, or corporation, which would prevent, restrict or hinder him/her in the performance of his/her duties and obligations under this agreement. Employee agrees that he/she will not make any agreements with or commitment to any person, firm or corporation that would prevent, restrict or hinder him/her in the performance of his/her duties or obligations under this agreement.

viii.   No Defense. Employee and Company agree that the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictions, covenants, and agreements contained herein.

ix.   Assignment. Employee expressly consents that the Company may assign this Agreement to any person, corporation, or other business or legal entity, which acquires all, or substantially all of the business and assets of Company. Additionally, Employee and Company acknowledge and agree that Company and its affiliates, subsidiaries, successors and assigns are express third party beneficiaries of this Agreement with an independent right to enforce any of its provisions.

x.   Prior Agreements. In the event that a court finds any paragraph, sentence, term or provision of this Agreement to be invalid or unenforceable, the parties intend and agree that the invalid or unenforceable provisions of this Agreement shall not be deemed to have superseded or replaced any provisions of any prior agreements entered into by the parties hereto with respect to the subject matter of this Agreement, and that any such prior agreements shall be given full force and effect.

xi.  Governing Law and Waiver.  Virginia law shall govern the construction, enforceability and interpretation of this agreement.  The parties intend the provisions of this agreement to supplement, but not displace, their respective rights and responsibilities under the laws of the Commonwealth of Virginia, as amended from time to time.  The failure of either party to insist upon performance of any of the provisions of this Agreement or to pursue their rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such rights.

IN THE WITNESS WHEREOF, the parties have executed this Agreement on the date and year first above written.

EMPLOYEE:                                    WITNESS:

Colleen Tucci                                Laura Moyer
Print Name                                   Print Name

_____ 8-11-08                            _____ 8/11/08
Sign Name        date signed                 Sign Name        date signed

Page 5 of 5

# EXHIBIT "B"

)

## Confidentiality and Invention Agreement

This Intellectual Property and Invention Agreement ("Agreement") is entered into this ll day of Aug, 2008, by and between K2M, Inc., a Virginia corporation located at 751 Miller Drive SE Suite F-1, Leesburg VA 20175 ("K2M"), and Chilton Tucci ("Employee"), an individual living at Olde Corn Tarel Ct. Columbia, MD 21046

In consideration of the Employee's employment, the receipt of certain confidential information from K2M and of the mutual covenants contained in this agreement, the parties agree as follows:

1. Confidential Information. For purposes of this Agreement, "Confidential Information" shall mean any information or material which is proprietary to K2M or designated as Confidential Information by K2M and not generally known other than by K2M. Confidential Information also includes any information which K2M obtains from any third party which K2M treats as proprietary or designates as Confidential Information, whether or not owned by K2M. "Confidential Information" does not include the following: (i) information which is known by Employee at the time of receipt from K2M which is not subject to any other confidentiality obligation between the parties; (ii) information which is now, or which hereafter becomes, generally known to the industry through no fault of the Employee, or which is later published or generally disclosed to the public by K2M; or (iii) information, other than the "Work" (defined herein) of Employee hereunder, which is otherwise lawfully and independently developed by Employee, or lawfully acquired from a third party without any obligation of confidentiality.

2. Assignment of Inventions. Employee agrees that any inventions, ideas or original works of authorship in whole or in part conceived or made by Employee during or within six months after the term of his/her relationship with K2M which are made through the use of any of K2M's equipment, facilities, supplies, trade secrets, Confidential Information, or time, or which relate to K2M's business or K2M's actual or demonstrably anticipated research and development, or which result from any work performed by Employee for K2M (all of the foregoing collectively "Work"), shall belong exclusively to K2M and shall be deemed part of the Confidential Information for purposes of this Agreement (unless they are excluded from the definition of Confidential Information by virtue of the exclusions set forth in Section 1 above) whether or not fixed in a tangible medium of expression. Employee hereby, and at the time of creation, irrevocably assigns and transfers to K2M all right, title and interest in and to such Works, including but not limited to copyrights, patents and trade secrets. To the extent that any Work is subject to Copyright protection, Employee agrees to such Work shall be considered a work for hire within the meaning of the copyright laws. To the extent that any such Work is deemed not to be a work for hire, Employee agrees to assign such Work to K2M. This Agreement is not intended and shall not be interpreted to assign to or vest in K2M any of Employee's rights in any inventions

)

other that those listed on Exhibit A hereto. Employee further agrees to cooperate with and assist K2M in protecting any Confidential Information and Work, including but not limited to reviewing and executing documents such as patent applications and any other documents as reasonably requested by K2M.

3. Amendments. All amendments or modifications of this Agreement shall be binding upon the parties despite any lack of consideration so long as the same shall be in writing and executed by both parties hereto in accordance with the other terms of this Agreement.

4. Waiver. Performance of any obligation required of a party hereunder may be waived only by a written waiver signed by the party for whose benefit such obligation was to be performed, and such waiver shall be effective only with respect to the specific obligation described therein. The waiver by either party of any breach of this Agreement in any one or more instances shall in no way be construed as a waiver of any subsequent breach (whether or not of a similar nature) of this Agreement by the other party.

5. No Defense. Employee and K2M agree that the existence of any claim or cause of action of the Employee against the K2M, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by K2M of the restrictions, covenants, and agreements contained herein.

6. Assignment. Employee expressly consents that K2M may assign this Agreement to any person, corporation, or other business or legal entity, which acquires all, or substantially all of the business and assets of K2M. Additionally, Employee and K2M acknowledge and agree that K2M and its affiliates, subsidiaries, successors and assigns are express third party beneficiaries of this Agreement with an independent right to enforce any of its provisions. Employee may not assign this Agreement.

7. Severability. While the provisions hereof are considered by the parties to be reasonable in under the circumstances hereof, if any provision of this Agreement shall be determined by any court, arbitrator or other legal authority to be void, invalid, illegal or unenforceable in any respect for any reason whatsoever, but would be valid if part of the wording thereof were deleted or changed, then such provision shall apply with such modifications as may be necessary to make it valid and effective, and the court, arbitrator or other legal authority is authorized and directed to reform such provision to the minimum extent necessary to make such provision valid and enforceable in conformity with this Agreement. In the event that it is determined by such court, arbitrator or other legal authority that such provision(s) cannot be modified in accordance with the preceding sentence, then such provision(s) shall be deemed to be stricken herefrom, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.   **Governing Law; Forum.**  This Agreement was entered into in the Commonwealth of Virginia, and its validity, construction, interpretation and legal effect shall be governed by the laws and judicial decisions of the Commonwealth of Virginia applicable to contracts entered into and performed entirely within the Commonwealth of Virginia.  The parties expressly agree that any action at law or in equity arising out of or relating to this Agreement shall be filed and maintained only in the courts of the Commonwealth of Virginia for Loudoun County or the United States District Court for the District of Virginia.  The parties hereby consent and submit to the personal jurisdiction of such courts for the purposes of litigating any such action.

9.   **Attorneys' Fees.**  In the event any litigation or other proceeding is brought by either party arising out of or relating to this Agreement, the prevailing party in such litigation or other proceeding shall be entitled to recover from the other party all costs, attorneys' fees and other expenses incurred by such prevailing party in this litigation.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective on the date first set forth above.

EMPLOYEE:

_Colleen Tuca_
Print Name

_[signature]_          0-11-08
Sign Name          date signed

WITNESS:

_Laura Moyer_
Print Name

_[signature]_          8/11/08
Sign Name          date signed

EXHIBIT A

Disclose any invention, discovery, patent or patent application:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGN NAME:

_____

DATE:

_____